IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 13, 2024 Session

## BEN C. ADAMS v. BUCHANAN D. DUNAVANT, ET AL.

**Appeal from the Probate Court for Shelby County**
**No. PR-24390     Joe Townsend, Judge**

_____

### No. W2023-01505-COA-R3-CV

_____

This is an appeal from an interpleader action filed by a trustee of a trust who held funds that were to be distributed to a beneficiary but were subject to claims by other parties. The trial court granted the trustee permission to deposit the funds, discharged him from liability, and ordered some of the funds to be disbursed in accordance with settlement agreements the beneficiary had entered into in other litigation involving his children. The trial court proceeded to consider the claims of various other parties to determine who was entitled to the remainder of the interpleaded funds. Law firms who had represented the beneficiary in separate litigation filed an answer and claimed that they had an attorney charging lien against the trust distributions. After an evidentiary hearing, the trial court determined that the law firms presented no proof of an attorney lien against the trust distributions. As such, the trial court ordered the remaining funds to be distributed to other parties. After an additional hearing on motions to revise, the trial court again found that no attorney lien existed. The law firms appealed. For the following reasons, the decision of the trial court is hereby affirmed and remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY W. ARMSTRONG, J., joined.

William F. Burns, Frank L. Watson, III, and William E. Routt, Memphis, Tennessee, for the appellant, Watson Burns, PLLC.

John S. Golwen and Alex Agee, Memphis, Tennessee, for the appellant, Bass, Berry & Sims, PLC.

Patrick Walker, Memphis, Tennessee, for the appellant, Buchanan Dobson Dunavant.

Lynn W. Thompson, Memphis, Tennessee, for the appellee, Ben C. Adams, as Trustee of the William B. Dunavant, Jr. Irrevocable Insurance Trust dated December 15, 1984 and the Dunavant Children's Sprinkle Trust dated April 1, 1991.

George Nassar, Jr., and Jeremy G. Alpert, Memphis, Tennessee, for the appellees, Mary Douglas Dunavant (individually, and as Guardian for Mary Wilkinson Dunavant and Lucy Hughes Dunavant), and Lillian Gardner Dunavant.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Buchanan ("Buck") Dunavant has been involved in several different lawsuits in Shelby County courts, which give rise to various claims asserted in this interpleader case. Therefore, we must recount the procedural history of the other litigation to the extent that it impacts the issues before us on appeal.

In 2020, Buck filed the first relevant lawsuit against his father, William Dunavant, in circuit court. According to the complaint, Buck's parents had divorced in 1975, when Buck was four years old, and they entered into a marital dissolution agreement at that time. The complaint alleged that Buck was unaware of the content of the MDA until his mother died in 2016, and he was provided a copy of it after her estate was administered. According to the complaint, the MDA provided that Buck's father had already created four trusts for Buck's four older siblings, but Buck was not born when those trusts were created, so "in order to equalize the inheritance," his father would provide life insurance for his benefit. Specifically, the MDA provided that Buck's father would "create an irrevocable life insurance trust to receive insurance proceeds for Buck's benefit," and "[t]his Trust will provide that, from the first proceeds paid on death, the Trustee will hold for Buck's benefit an amount equal to the average of the after-tax funds received from the other four Trusts." The circuit court complaint alleged that Buck "never received any notice whatsoever regarding a trust," his father "refused to speak with [him] about the MDA or any other matter," and his father had threatened to disinherit him. Buck asserted that he was a third party beneficiary of the MDA and that, upon information and belief, his father had breached the MDA by failing to provide insurance for his benefit, failing to create an irrevocable trust for his benefit, failing to provide him "a benefit in an amount equal to the average of the after-tax funds received from the other four Trusts for [his] siblings," and by disinheriting or taking steps to disinherit him. Buck was represented in the circuit court action by attorneys from two law firms -- Bass, Berry, & Sims, PLC and Watson Burns, PLLC ("the Circuit Court attorneys"). At some point during the circuit court litigation, Buck discovered that, in 1984, his father had in fact created a life insurance trust -- the William B. Dunavant, Jr. Irrevocable Insurance Trust ("1984 Trust"). In addition, a 1991

Dunavant Children's Sprinkle Trust ("1991 Trust") was discovered. Early on during the circuit court litigation, in the context of an order denying summary judgment motions, the circuit court found that there were disputed facts about whether the 1984 life insurance trust could fully satisfy Buck's father's obligation under the MDA, but the court ruled that the amount Buck did receive from the 1984 Trust would be offset as a credit against any damages he might ultimately be awarded. Buck's father was in his late 80s during the litigation and apparently in poor health, and he died in 2021 while the circuit court case remained pending. The personal representative of his estate was substituted as a party. Buck was expected to receive trust distributions from the 1984 and 1991 Trusts exceeding $1.1 million beginning on or about April 1, 2022.

The next case that is pertinent to this appeal began in probate court in 2021. It was filed by Buck's ex-wife, Mary Dunavant (individually and as guardian of their two children who remained minors) and their adult daughter Lillian Dunavant (collectively, "the Dunavant children"). The Dunavant children alleged that Buck had mishandled assets held for their benefit in yet another trust – the Buchanan D. Dunavant 2011 Descendants Trust – as well as three UTMA accounts in the names of his three children. Buck was the Trustee of the Descendants Trust and custodian of the UTMA accounts. The probate court ordered that this case be separated and filed as four separate companion cases consisting of one case for the Descendants Trust and one case for each of the UTMA accounts. (The parties hereto refer to these four cases collectively as the Descendants Trust cases or four probate cases, so we will sometimes do the same.) Buck was represented in these four lawsuits by Patrick Walker from the law firm Harris Shelton, PLLC. The probate court ordered Buck to provide a full accounting, including bank and brokerage statements reflecting all current assets for the trust and accounts. In March 2022, the Dunavant children filed an amended petition and named as a nominal party the Trustee of the 1984 and 1991 Trusts, Ben Adams, for the purpose of enjoining the distributions due to Buck from those trusts. The probate court granted the Dunavant children a temporary restraining order and later a temporary injunction, enjoining Mr. Adams from making the expected distributions to Buck. According to the probate court's order on the temporary injunction, Mr. Adams, as trustee, acknowledged and submitted to the probate court's jurisdiction over the trusts. The probate court's order states that there were strong allegations and a likelihood of commingling of funds and that it was appropriate to maintain the status quo to allow Buck to provide an accounting and allow Mr. Adams to safeguard the funds to be distributed to Buck until such time as the issues could be resolved.

Also in March 2022, Buck's Circuit Court Attorneys filed an "Attorney Charging Lien" *in the probate court litigation*, stating that they claimed an attorney lien on any distributions to Buck from the 1984 and 1991 Trusts. They later filed an amended attorney charging lien along with a motion to enforce their attorney lien. The lien stated that the attorneys were filing an attorney charging lien for legal services rendered to Buck in the circuit court litigation and other matters. It stated that the Circuit Court Attorneys had entered into a fee agreement with Buck pursuant to which they were entitled to 40 percent

of any gross recovery he was entitled to collect "from any Dunavant Trust and/or Dunavant Estate." Thus, the Circuit Court Attorneys asserted that they were entitled to recover their fees from the distributions from the 1984 and 1991 Trusts. The notice stated that the attorney charging lien was filed "[p]ursuant to Sections 23-2-102 and 23-2-103 of the Tennessee Code" and the provisions of trusts.[1]

When Buck failed to provide the ordered accounting, the probate court judge found sufficient evidence that he was likely in contempt of court and issued show cause orders in each of the probate cases, setting a show cause hearing to address the issue of contempt. However, the parties appeared before the court at that hearing and announced that Buck and the Dunavant children had entered into tentative settlement agreements resolving the probate court cases. In those settlement agreements, Buck agreed that most of his distribution from the 1984 life insurance trust would be paid to the Descendants Trust and the UTMA accounts of the Dunavant children to resolve their claims. The Circuit Court Attorneys appeared at the hearing and opposed any settlement agreement that would interfere with their claimed attorney charging lien on 40 percent of the trust distributions. The probate court referred the parties and the Circuit Court Attorneys to mediation and scheduled a status conference for September 27, 2022. Mediation was unsuccessful.

On September 1, 2022, a new probate court judge, Joe Townsend, took office. On September 2, the Dunavant children filed a motion in each of the four probate cases seeking approval and enforcement of their settlement agreements with Buck, providing that a portion of the trust distributions due to him would be paid to the Dunavant children. Judge Townsend held a hearing on September 27, 2022, which was the date of the status conference scheduled by the previous judge. During the hearing, the Circuit Court Attorneys clarified that they had not filed any petition before the probate court, only a notice of their attorney lien. The Circuit Court Attorneys filed a sworn declaration from Buck, which stated that he acknowledged and affirmed the validity of the attorney charging lien. The declaration stated that Buck had retained the Circuit Court Attorneys to represent him in the circuit court litigation and entered into a fee agreement with them whereby they were "entitled to forty percent (40%) of any gross recovery (plus expenses) that I have a

---

[1] The cited statutes, Tenn. Code Ann. §§ 23-2-102 and -103, provide:

**§ 23-2-102. Attorneys liens**
Attorneys and solicitors of record who begin a suit shall have a lien upon the plaintiff's or complainant's right of action from the date of the filing of the suit.

**§ 23-2-103. Attorneys liens; commencement of employment**
Any attorney or solicitor who is employed to prosecute a suit that has already been brought in any court of record shall have a lien upon the plaintiff's right of action from the date of the attorney's or solicitor's employment in the case; provided, that the record of the case shall first be made to show such employment by notice upon the rule docket of such court, by a written memorandum filed with the papers in the case or by notice served upon the defendant in the case.

right to collect from any Trust created by my father and/or from any source of funds stemming or coming from his Estate." Buck's sworn declaration further stated that he acknowledged and affirmed that the Circuit Court Attorneys were entitled to the fees and expenses outlined in detail in their attorney charging lien in the sum of $526,162.40 "payable from my 1984 and 1991 Trusts." Even though the circuit court litigation was still pending, the Circuit Court Attorneys nevertheless insisted they were "entitled to take a fee" on the trust distribution due to Buck pursuant to their fee agreement and also entitled to an attorney lien.

After the hearing, the probate court entered orders in each of the four probate cases approving the settlement agreements entered into by Buck and the Dunavant children. The orders stated that Buck consented that funds owed to him from the 1984 life insurance trust would be disbursed to the Descendants Trust and UTMA accounts established for his children as consideration for the release. The orders noted that a "claimed attorney charging lien" was filed by Buck's counsel in separate litigation but stated that no attorney lien would attach to the trust distribution funds. The orders provided that any funds remaining after the payments in accordance with the settlement agreements would be distributed to Buck "or however [he] directs." Pursuant to these orders, Mr. Adams was directed to disburse $350,000 to the Descendants Trust and sums to each of the UTMA accounts totaling $196,520, $61,367, and $197,494. After the probate court entered the orders enforcing the settlement agreements, the Circuit Court Attorneys filed motions to alter or amend. As such, the trustee did not immediately disburse the funds as provided in the aforementioned orders. At a hearing on November 2, 2022, the Circuit Court Attorneys requested a hearing date on the motions to alter or amend, but the probate court judge indicated that he did not intend to hear those motions because he had enforced settlement agreements between the only parties to the probate court cases, and the Circuit Court Attorneys were nonparties. Thus, the probate court judge reasoned that the motions to alter or amend filed by the Circuit Court Attorneys were not properly before him.

The case presently before us was filed on November 29, 2022, by Trustee Ben Adams. He filed, under a separate docket number in probate court, a "Trustee's Petition to Interplead Funds and for Discharge from Liability." The Trustee's petition stated that he held over $1 million in funds from the 1984 and 1991 Trusts for the benefit of Buck. The Trustee asserted that certain funds had been ordered to be paid to the Dunavant children as part of the settlement of the four probate cases and to Buck's attorney in the four probate cases, Patrick Walker from Harris Shelton. However, the Trustee noted that the Circuit Court Attorneys claimed an attorney lien against the same trust distribution, and the competing claims against the funds exceeded the balance due from the trusts. The Trustee asserted that if he paid the amounts owed to the Dunavant children pursuant to the settlement agreements, he would be subject to a lawsuit filed by the Circuit Court Attorneys. At the same time, he asserted that if he paid the Circuit Court Attorneys, he would not have sufficient funds left to pay the amounts awarded by the court orders in the four probate cases, potentially creating a situation in which he could be found in contempt.

- 5 -

Because the funds were subject to competing claims that could subject the Trustee to multiple lawsuits, the Trustee moved the court pursuant to Tennessee Rule of Civil Procedure 22 for an order permitting him to deposit the disputed funds with the court clerk and for a discharge from liability and further participation in the case. The Trustee also sought an award of his attorney fees and trustee fees. The respondents named in the interpleader petition were: the Circuit Court Attorneys, Buck Dunavant, Mary Dunavant (individually and on behalf of the minor children), Buck's adult daughter Lillian Dunavant, and the law firm who represented Buck in the probate court cases, Harris Shelton. Counsel for the Dunavant children filed a notice of appearance. Attorneys from Watson Burns and Bass, Berry, & Sims filed notices of appearance on behalf of the Circuit Court Attorneys.

One week after the interpleader petition was filed, on December 6, 2022, the Circuit Court Attorneys filed, in the interpleader action, a notice of an attorney charging lien. Again, the notice stated that it was filed pursuant to Tennessee Code Annotated sections 23-2-102 and -103 and the terms of the trusts. The notice purported to inform all parties that the Circuit Court Attorneys represented Buck in the circuit court case against his father and other matters and entered into a fee agreement in connection with that representation entitling them to forty percent of any recovery Buck had a right to collect from any Dunavant trust. As such, the Circuit Court Attorneys maintained that they had an attorney charging lien, for legal services rendered to Buck in circuit court, on any assets distributed or received in connection with the 1984 and 1991 Trusts. They claimed that they were entitled to $453,714 in attorney fees plus $67,348 in expenses, which continued to accrue. They also asserted that their attorney lien had priority over any interest that the Dunavant children purported to have from the four probate cases.

That afternoon, the Circuit Court Attorneys also filed a motion for recusal of Judge Townsend in the interpleader case. The recusal motion was primarily based on the fact that Judge Townsend had submitted an affidavit as an expert witness, when he was still in private practice, opining as to the reasonableness of an attorney fee charged by the Watson Burns law firm (one of the firms of the Circuit Court Attorneys), calling it "outrageous" and its billing records "objectionable." The Circuit Court Attorneys argued that Judge Townsend could not be impartial to Watson Burns based on his previous involvement as an expert witness, and they argued that certain rulings already made by him in probate court demonstrated his lack of impartiality.

Judge Townsend was never made aware of the recusal motion, and the next day, on December 7, he entered an order granting the Trustee's petition to interplead the funds, discharging the Trustee from liability, and ordering a portion of the interpleaded funds to be paid to the Dunavant children to satisfy the settlement agreements Buck entered into during the four probate cases. The Circuit Court Attorneys sought an accelerated interlocutory appeal pursuant to Tennessee Supreme Court Rule 10B. This Court issued an opinion finding that Judge Townsend failed to address the recusal motion, so we vacated the probate court's order entered while the recusal motion was pending and remanded for

- 6 -

the court to resolve the recusal motion. *See Adams v. Dunavant*, No. W2022-01747-COA-T10B-CV, 2023 WL 1769356 (Tenn. Ct. App. Feb. 3, 2023).

On February 8, 2023, Judge Townsend entered an order denying the recusal motion. At the outset, he stated that he was unaware that a recusal motion had been filed on December 6 when he entered the order granting the Trustee's petition on December 7. As for the merits of the recusal motion, Judge Townsend concluded that his expert affidavit from 2017 did not warrant recusal. He also noted that adverse rulings against a party do not provide grounds for recusal.

On February 13, Judge Townsend entered a separate order, which he admittedly noted mirrored his prior (vacated) order granting the interpleader petition, with a few modifications. The order again permitted the Trustee to interplead the funds at issue with the probate court clerk, discharged the Trustee from liability, and relieved the Trustee from further participation in the case. The court recognized that the Circuit Court Attorneys had filed an attorney charging lien against the trust distributions due to Buck but noted there had been no hearing on any petition to award attorney fees to the Circuit Court Attorneys. The order stated that Tennessee's appellate courts had set a high bar for enforcement of attorney liens and prohibited courts from enforcing attorney liens without providing the client a hearing on the petition. According to the order, the Circuit Court Attorneys had advised the probate court that no hearing on attorney fees had been held in circuit court. Furthermore, the probate court found that Buck had entered into the settlement agreements in the probate court cases just before a show cause hearing on contempt matters, so it was in his interest to settle those cases. The order stated that if those settlements were set aside, Buck would be at risk of being held in contempt, so the Circuit Court Attorneys were not acting in his interest and should forfeit any attorney charging lien. The order stated, however, that the absence of an attorney charging *lien* did not mean that the Circuit Court Attorneys forfeited their right to be *awarded* attorney fees, as a lien would only serve as a security interest. The order stated that the remainder of the interpleaded funds from the trust distribution were payable to Buck, but in order to achieve judicial economy, the court would assume jurisdiction over a petition for attorney fees, if filed by the Circuit Court Attorneys, so that they would not have to file a separate petition for fees in the circuit court case. In summary, the probate court ordered that the clerk should distribute from the interpleaded funds sums of $350,000, $196,520, $67,367, and $197,494 in accordance with Buck's settlement agreements in the four probate cases. The remainder of the funds were to be paid to Buck, but distribution was "pause[d]" pending further orders of the court. The probate court ruled that the Circuit Court Attorneys had no attorney charging *lien*. However, they were permitted to file a petition for attorney fees within thirty days, and if they did not, the remainder of the funds would be distributed to Buck.

The Circuit Court Attorneys again filed a Rule 10B appeal for review of Judge Townsend's order denying the recusal motion. This Court issued an opinion on April 25, 2023, finding a reasonable basis for questioning the judge's impartiality and reversing and

remanding for reassignment. *See Adams v. Dunavant*, No. W2023-00304-COA-T10B-CV, 2023 WL 3066511 (Tenn. Ct. App. Apr. 25, 2023). This Court concluded that the expert opinion offered by the judge "might be insufficient alone to justify recusal," but when considered alongside "the relief the probate court granted on the petition for interpleader," this provided "an additional basis for questioning impartiality." *Id.* at *4. Specifically, we noted that Judge Townsend entered an order providing that the Circuit Court Attorneys forfeited any attorney charging lien even though no party had answered the petition for interpleader and the Trustee had not requested that relief in his petition. *Id.* We also noted that Judge Townsend seemingly made factual findings without holding an evidentiary hearing, and he had ordered distribution of interpleaded funds to some claimants without hearing from all of the competing claimants. *Id.* Taking all these facts together, we found a reasonable basis for questioning his impartiality. *Id.* The Dunavant children filed an application for permission to appeal to the Tennessee Supreme Court, and the Supreme Court reversed this Court's decision, holding that Judge Townsend's denial of the recusal motion was appropriate. *See Adams v. Dunavant*, 674 S.W.3d 871 (Tenn. 2023). First, the Supreme Court found that the 2017 expert affidavit did not indicate bias because it was not sufficiently related to the issues in this case, and the expert opinion was "not an objectively reasonable basis for questioning the probate judge's impartiality." *Id.* at 880. Next, the Supreme Court explained that Judge Townsend's adverse rulings in the interpleader action and four probate cases did not create an objectively reasonable basis for questioning his impartiality. *Id.* at 880. The Court noted, however, that the only order properly before the reviewing court in a Rule 10B appeal is the recusal order, so the Court expressed no opinion on "the legal propriety" of the other rulings in the interpleader action. *Id.* The Court simply held that the adverse rulings were "not sufficient to support a conclusion that 'a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" *Id.* (quoting *Cook v. State*, 606 S.W.3d 247, 255 (Tenn. 2020)). The Court remanded for further proceedings. *Id.* Its opinion was issued on July 21, 2023. *Id.*

Back in probate court, the Circuit Court Attorneys filed an "Answer and Affirmative Defenses" to the interpleader petition. Notably, they were the only respondents named in the interpleader petition who ever filed an answer to the petition. The Circuit Court Attorneys admitted most of the allegations in the Trustee's interpleader petition. In their affirmative defenses, the Circuit Court Attorneys asserted that they had "Contractual and Charging Liens," citing Tennessee Code Annotated section 23-2-102 and -103. The Circuit Court Attorneys contended that "[t]he trustee should be discharged of any liability if after *an actual hearing* on the merits conducted in open Court and if the Court so finds[.]"

On July 24, 2023, a document was filed in the interpleader action by one of the Circuit Court Attorneys, entitled "Declaration of Buchanan Dobson Dunavant." In the declaration, Buck described the fee agreement he entered into with the Circuit Court Attorneys, providing that they were entitled to forty percent of any gross recovery he had a right to collect from any trust created by his father. Buck explained that his father had

"created an irrevocable trust for the benefit of all of his children," including Buck, in 1984, and he also created another trust in 1991 for the benefit of Buck and his siblings. The declaration stated, "My agreement with my lawyers includes the assets that I am entitled to receive from the 1984 and 1991 Trusts and entitles my lawyers to forty percent (40%) (plus expenses) from the 1984 and 1991 Trusts." He agreed that his lawyers were entitled to receive $526,162.40 "payable from my 1984 and 1991 Trusts as referenced in their [] Attorney Charging Lien." The declaration further stated, "I am involved in the instant interpleader matter" and "represented in this matter by Patrick G. Walker of Harris Shelton, PLLC." Buck's declaration stated that he was *not* represented in this matter by the Circuit Court Attorneys from Watson Burns and Bass, Berry, & Sims. Buck's declaration stated that it was, and always had been, his intention that his assets from the trusts would be distributed by the Trustee to the escrow account held by Watson Burns "to be allocated per our agreement." Buck stated that the probate court's exercise of jurisdiction over the trust distributions prevented him from timely receiving the money and caused him to suffer "financial distress." He stated that "counsel for my ex-wife threatened me and told me I would be incarcerated if I did not resolve my ex-wife's claims," so he signed settlement agreements resolving the probate court litigation "under duress." He added, "I disavow those settlement agreements." The declaration stated that it was Buck's understanding that his ex-wife was trying to enforce the settlement agreements in this matter and that enforcement of them would prevent his lawyers from getting paid, which was never his intention. In conclusion, Buck's declaration stated that the Circuit Court Attorneys "should be paid pursuant to our agreement, and I am in favor of having a hearing and obtaining court confirmation of their liens if that is necessary for our agreement to be satisfied." He stated that if called to testify live, he would testify consistently with his declaration. Interestingly, however, the attorney who signed the certificate of service certifying that this declaration was filed electronically and sent to all parties was William Routt, and Buck's declaration stated, "I am involved in the instant interpleader matter . . . I am represented in this matter by Patrick G. Walker of Harris Shelton, PLLC. I am not represented in this matter by John S. Golwen or A. Alex Agee of Bass, Berry & Sims, PLC or William F. Burns, Frank L. Watson, III, or William E. Routt of Watson Burns, PLLC." Thus, we presume that this declaration was filed not on behalf of Buck but on behalf of the Circuit Court Attorneys.

Later that day, the Circuit Court Attorneys filed a motion to enforce their attorney lien, stating that Buck had "re-affirmed his contractual relationship in the Declaration he filed with the Court on July 24, 2023." The motion stated, "Pursuant to Tennessee statutory law and a contract between the Firms and Mr. Dunavant, the Firms enjoy both a statutory lien and a contractual lien in connection with the assets held in these Trusts." It stated that the "liens are established both under Tennessee statute as a charging lien and by contract through the Firms' fee agreement with Mr. Dunavant." The motion again cited Tennessee Code Annotated sections 23-2-102 and -103. It explained that Buck was originally represented in the circuit court litigation by Bass, Berry & Sims on an hourly rate basis, but while the case was pending, he entered into a new arrangement with Bass, Berry &

- 9 -

Sims based on a contingency fee arrangement, and Bass, Berry & Sims "enlisted" Watson Burns as co-counsel to assist in the representation under a contingency fee agreement. According to the motion, the fee agreement entered into by Buck provides that the Circuit Court Attorneys are "entitled to receive a contingency fee from any source, including any Dunavant Trust and/or Dunavant Estate of which he is a beneficiary or claimant from which he receives . . . any funds or distribution of any kind." They stated that the fee agreement was protected by attorney-client privilege but that they would submit it with the court's permission for in camera review. The Circuit Court Attorneys also stated that they "do not and have never represented Mr. Dunavant in the Probate Court litigation." Still, they insisted that the trust distributions were "subject to a statutory charging lien under Tennessee law." They argued that the probate court should enforce their "statutory and contractual liens" because it had assumed control and exercised jurisdiction over the funds at issue. They asked the court to enter an order enforcing their liens and allow the assets to be distributed "in a manner that is consistent with the liens."

Three days later, Patrick Walker of Harris Shelton filed a notice of appearance as counsel on behalf of Buck and Harris Shelton. Harris Shelton, who was also named as a respondent in the interpleader action, also filed an attorney charging lien pursuant to Tennessee Code Annotated sections 23-2-102 and -103 based on its representation of Buck in the four probate court cases and the interpleader case. It claimed that Buck had assigned the proceeds of the 1984 Trust to Harris Shelton pursuant to a fee agreement, so it claimed a lien in the amount of $44,479.59. Harris Shelton also filed a motion to enforce its lien, and later, a separate petition to grant it an attorney lien.

On July 31, 2023, the Trustee, Ben Adams, filed a notice of deposit of the trust funds with the clerk of the court, stating that he had deposited the assets of the trusts pursuant to the probate court's order of February 13, 2023. At some point thereafter, the clerk completed the distributions required by the February order, but not all of the funds were distributed, so the balance remained on deposit with the clerk pursuant to the order pausing further distributions pending further orders. The Trustee filed a petition for additional fees.

Around this time, the circuit court entered a final order granting summary judgment in the circuit court litigation, concluding that the MDA provisions at issue were unenforceable due to the absence of essential terms related to the obligation to establish an irrevocable life insurance trust. The circuit court reasoned that there was "no way to determine the parties had a meeting of the minds about what was required of [Buck's father] to achieve the intended result," there were "omissions in the contract and the mechanism for quantifying Petitioner's inheritance," and the MDA did not specify a time for performance or the amount of insurance he was to procure.[2] On appeal, this Court

---

[2] The circuit court's order did note, however:

The only irrevocable life insurance trust [Mr. Dunavant] had established for direct payout

- 10 -

affirmed. *See Dunavant v. William B. Dunavant, Jr. Revocable Living Tr.*, No. W2023-01213-COA-R3-CV, 2024 WL 4211156 (Tenn. Ct. App. Sept. 17, 2024). However, the Tennessee Supreme Court ultimately vacated and remanded that decision for further consideration in light of its decision in *Pharma Conference Education v. State*, 703 S.W.3d 305 (Tenn. 2024). *See Dunavant v. William B. Dunavant, Jr. Revocable Living Tr.*, No. W2023-01213-SC-R11-CV, 2025 WL 918941 (Tenn. Mar. 17, 2025). On remand, we concluded that the MDA was not too vague to enforce and remanded to the circuit court for further proceedings. *Dunavant v. William B. Dunavant, Jr. Revocable Living Tr.*, No. W2023-01213-COA-R3-CV, 2025 WL 2750503, at *6 (Tenn. Ct. App. Sept. 29, 2025). Specifically, we remanded to the circuit court "for the calculation of damages due to Mr. Dunavant's breach of contract by failure to create the irrevocable life insurance trust envisioned by paragraph 3(b) of the MDA." *Id.* The Tennessee Supreme Court denied permission to appeal on January 15, 2026.

Meanwhile, in the interpleader action, Mary Dunavant, in her individual capacity, filed a notice of intent and attempt to levy on the funds held by the probate court clerk. She asserted that she had obtained a money judgment against Buck in a different circuit court case involving child support and alimony arrearages, totaling nearly $400,000, and her judgment had been recorded in the county register's office since 2022. She formally gave notice of her claim to any remaining funds held by the probate court clerk.

In August 2023, the Circuit Court Attorneys filed, in the interpleader action, a separate petition for an award of their attorney fees and expenses based on their representation in the circuit court case, citing the probate court's February 2023 order that had directed them to file such a petition and paused any distribution of the remaining funds to Buck. In a footnote, however, the Circuit Court Attorneys stated that they were not conceding that the probate court's exercise of jurisdiction over a petition for attorney fees in the circuit court case was lawful or necessary. They asserted that their "liens are established both under Tennessee statute as a charging lien and by contract through the Firms' fee agreement." They also argued that their entitlement to a fee was not "contingent" on prevailing in the circuit court litigation but only contingent on Buck's right to receive distributions from any source stemming or coming from his father's estate or trusts. They claimed that no "judicial approval" was required for them to obtain their attorney fees. However, they asked the court to grant their petition and enforce their statutory and contractual liens. The Circuit Court Attorneys also pointed out that the

to Petitioner was one created in 1984 to benefit all the Dunavant children equally. Petitioner, along with his siblings, is expected to receive approximately $1,139,724.00 from that trust. If that amount equals or exceeds the 'average of the after-tax funds received' by Petitioner's siblings from the pre-MDA trusts for their benefit, Dunavant would have met his obligations to Petitioner under the MDA. Furthermore, if Dunavant's obligations were enforceable and what Petitioner is due under the MDA could be determined, the $1,139,724.00 would offset the amount payable to Petitioner under the MDA.

- 11 -

probate court had entered its order granting the interpleader, directing the deposit of the funds, and discharging the Trustee without holding a hearing as required by Tennessee Rule of Civil Procedure 22.02 or awaiting answers from the parties. In support of their motion, the Circuit Court Attorneys submitted declarations from the two of the attorneys who represented Buck in circuit court, who described the contingency fee arrangement they entered into with him.

The probate court entered an order scheduling "the trial" on the petitions for attorney fees. The order stated that the court would determine the attorney fees, if any, to be awarded from the balance of funds held by the probate court clerk. The court reiterated that its February 2023 order had stated that any distributions of the balance to Buck would be paused so that the various law firms would have an opportunity to file petitions for attorney fees to be distributed from the balance, and the court would assume jurisdiction over the fee issue for judicial economy. The order set "[t]he trial on the merits" for October 12.

The court also set a hearing on the issue of Mary Dunavant's notice of levy and claim to priority for her support judgment. In response, a "Notice of Filing" was filed by the Circuit Court Attorneys, purportedly on behalf of Buck, attaching a copy of a motion to quash garnishment and levy that had been filed in the child support litigation. An attorney from a different law firm, Markowitz Law Group, PC, then filed a notice of appearance on behalf of Buck, stating that he would be appearing "to address the limited issue of the impropriety of the issuance of a levy/garnishment to the Clerk of the Probate Court[.]" The Markowitz firm then filed Buck's memorandum of law in opposition to the levy. (Buck had never filed an answer to the interpleader petition, and this was the first and only memorandum he filed in the interpleader action.) The record also contains an affidavit of Buck that was filed and states that he had reviewed the fees incurred by Harris Shelton totaling $44,479.59, found them reasonable, and did not dispute the fees and expenses sought by Harris Shelton.

Mary Dunavant filed a response to the petitions for attorney fees and/or liens, individually and on behalf of the children, clarifying that they did not oppose any of the various claimants being paid whatever fees were owed to them, but she insisted that no *attorney lien* rights existed. In fact, she pointed out that the probate court had already determined, in its order granting the interpleader, that no lien rights existed. As a result, Mary Dunavant argued that the lien issue had already been resolved, and the only issue remaining was the disposition of the remaining trust funds not disbursed pursuant to the order granting the interpleader. Nevertheless, Mary argued that the Circuit Court Attorneys were not entitled to any attorney charging lien under Tennessee Code Annotated sections 23-2-102 and -103 given the fact that Buck had never obtained any *judgment* in his favor in the circuit court litigation (or, for that matter, the probate cases either). She contended that Buck's distribution from the 1984 Trust did not constitute a judgment or occur due to action of the Circuit Court Attorneys, so there was no lien on it. She also noted that the

- 12 -

Circuit Court Attorneys never represented Buck in the probate court actions where they filed their attorney charging lien. Thus, she maintained that the liens claimed by the Circuit Court Attorneys were invalid.

The probate court held its evidentiary hearing as scheduled on October 12, 2023. At the outset, counsel for the Circuit Court Attorneys pointed out "for the record" that the probate court did not have a hearing *prior to* granting the Trustee's petition for interpleader. The trial judge announced that the funds remaining on deposit with the probate court clerk totaled $186,568.93. The court then heard arguments regarding the claim asserted by Mary Dunavant in connection with her judgment for child support and alimony. Next, the court heard arguments on the various issues involving attorney fees claimed by the Trustee, the Circuit Court Attorneys, and Harris Shelton. The trial judge asked for clarification from the attorneys as to who exactly they represented, particularly with respect to Patrick Walker from Harris Shelton. He stated that he represented his law firm "and Buck Dunavant, I mean, and to the extent that he is before the Court." He noted that the petitions for attorney fees were "for the law firms" but said he "still represent[ed] Buck Dunavant in the matter." He went on to address Harris Shelton's request for attorney fees and noted that he had filed Buck's affidavit agreeing to the award. The trial judge then stated, "Counsel, this is an evidentiary hearing. I can't accept an affidavit in an evidentiary hearing. I can accept his testimony." Consequently, the trial judge permitted Mr. Walker to call Buck and have him testify telephonically. Buck then testified that he had reviewed the fees and expenses of Harris Shelton and found them to be reasonable. He testified that he wanted those attorney fees to be paid from the funds currently on deposit with the clerk of the court.

The trial judge then heard from the Circuit Court Attorneys and again noted that he had set this matter for an evidentiary hearing. Counsel again noted that the court "never had a hearing" at the initial stage of the interpleader action. The trial judge pointed out that "this is an evidentiary hearing." The Circuit Court Attorneys argued that they had "not just a charging lien" but "a contractual lien," although they recognized the probate court's prior ruling that no attorney lien existed. Aside from the lien issue, on the issue of whether an award of attorney fees was warranted, the Circuit Court Attorneys went back and forth between insisting that the probate court lacked jurisdiction over the issue of attorney fees and asking the court to recognize their petition for fees and award them fees from the remaining funds. They noted that Buck had acknowledged their attorney fees in his declaration. The trial judge stated, "I don't have any evidence in front of me." Counsel indicated his intention to also call Buck to have him testify telephonically, which the trial judge stated he would accommodate, but for whatever reason, that never occurred during the remainder of the hearing. When the trial judge reminded counsel later that "I don't have any testimony from your client," his response was, "Your Honor, you don't have to grant the petition. But when we appeal and reverse you, we have a lien. So we'll do that."[3]

---

[3] According to a later order, the trial judge expected counsel for the Circuit Court Attorneys to request that Buck testify telephonically, "[b]ut they apparently changed their minds and excused themselves

- 13 -

Counsel ultimately suggested that the probate court pay Harris Shelton the amount owed to it and then pay the Circuit Court Attorneys the balance to at least pay toward its expenses. The trial judge stated that he was trying to accommodate the Circuit Court Attorneys by considering whether they were owed attorney fees and that if they objected to him assuming jurisdiction over that issue then the court may just decline to consider it. The Dunavant children reiterated their position that they did not oppose any awards of fees, but they insisted that no liens existed and that the probate court's order should not interfere with its previous order distributing the funds to them pursuant to the settlement agreements.

Mr. Markowitz, Buck's attorney who represented him regarding the levy issue and child support judgment, announced that he had Buck waiting on the phone again and that they had come to an agreement with Mary Dunavant's attorney. Buck testified briefly and confirmed their agreement that whatever money was left after the probate court's rulings regarding the attorney fee matters would be split equally and paid one-half toward satisfying the child support judgment and one-half to the Markowitz firm to be paid to Buck.

On October 13, 2023, the probate court entered an order distributing the balance of the interpleaded funds. The order noted that the court had granted the petition for interpleader in February 2023, the Trustee had deposited the funds in July 2023, and the clerk then completed the initial distributions required by the February order. The order stated that various parties sought to be awarded fees, and Mary asserted a claim in connection with a child support judgment. Ultimately, the court awarded the fees requested by the Trustee, which amounted to $9,750 in attorney fees and $1,500 in trustee fees. The probate court found that Buck testified and consented to payment of $44,479.59 from the interpleaded funds to Patrick Walker of the Harris Shelton firm, and the court ordered that amount paid as well. The court also noted that Buck's counsel with respect to the post-divorce judgment and counsel for Buck's ex-wife had orally moved for approval of a settlement agreement, whereby any funds remaining after the payment of fees would be paid equally to Buck and to satisfy the judgment for support. The court found it appropriate to approve that settlement agreement and directed the clerk to distribute the balance in that manner. The court noted that the Circuit Court Attorneys presented oral argument but submitted no evidence or proof of any kind. The order stated that a separate order would be entered to address the issues involving the Circuit Court Attorneys.

Shortly thereafter, on October 24, 2023, the Trustee filed a notice that he was depositing $420 in earned income that had accrued after closing of the trust. The Circuit Court Attorneys filed a notice of appeal to this Court on October 26, 2023. On November 13, 2023, the probate court entered an order addressing the arguments of the Circuit Court Attorneys. The court recognized that a notice of appeal had been filed but stated that it had not completed its adjudication of the issues. The order stated that during the October 12

from the hearing."

- 14 -

hearing, the Circuit Court Attorneys objected to the court exercising jurisdiction over a petition for their attorney fees in the circuit court case and did not concede that any petition or court order was necessary for them to be paid their fees, so they elected not to have their client testify. However, the order stated that the Circuit Court Attorneys had in fact filed an answer and affirmative defenses along with a petition for attorney fees, months after the February 2023 order granting the interpleader, and the court had never held a hearing on those matters. The probate court stated that it would treat those filings as motions to revise a nonfinal order pursuant to Tennessee Rule of Civil Procedure 54.02. It then set a status hearing for November 2023. The court later set the motions to revise for a hearing in March 2024. The Circuit Court Attorneys then filed a written motion to revise, stating that they had been directed to do so by the probate court. Mary and the Dunavant children filed responses in opposition. They pointed out that even though the Circuit Court Attorneys had filed an attorney charging lien specifically citing Tennessee Code Annotated sections 23-2-102 and -103, "[they] now claim instead they have some sort of nebulous contractual lien." The probate court held a hearing on the matter in March 2024. The Circuit Court Attorneys acknowledged that the liens they filed cited the applicable attorney lien statutes addressing recovery in a lawsuit, but they insisted that they were also entitled to a "contractual lien" against the trust distributions, "and that is a lien irrespective of any recovery" in a lawsuit. They insisted that "the law does not hinge [] recovery under some Tennessee statute, but under the contract itself." The Dunavant children maintained that the Circuit Court Attorneys did not meet the statutory criteria for an attorney charging lien, and there was no legal precedent for their new argument that an attorney lien can exist "just by contract outside of the statute."

Oral argument was held in this Court in November 2024. However, the probate court had never entered any written order resolving the motions to revise. This Court entered a show cause order directing the appellants to supplement the record with a final judgment resolving the outstanding motions. The probate court subsequently entered an order denying the motions to revise. Pertinent to this appeal, the court again found that the Circuit Court Attorneys had no attorney liens. The probate court found that Buck had been a beneficiary of the 1984 Trust since it was established in 1984, and the Circuit Court Attorneys performed no work causing that to happen. The court found that the Trustee was obligated to make the trust distributions to Buck under the terms of the 1984 life insurance trust instrument, so Buck was entitled to those distributions regardless of whether he ever hired the Circuit Court Attorneys. The order stated that the Circuit Court Attorneys had never produced the fee agreement and that it was not in the record, so the court could not know whether it applied to the trust distributions. Still, the probate court concluded that the liens claimed by the Circuit Court Attorneys simply did not exist under Tennessee law, and without valid lien rights, the entire basis of their interference in probate court was null and void. It explained that attorney liens under Tennessee Code Annotated sections 23-2-102 and -103 have very specific statutory requirements, and the liens asserted here did not meet those criteria. The court explained that the statutes provide a lien on a plaintiff's right of action and attaches to proceeds flowing from a judgment on the plaintiff's behalf, but

- 15 -

here, no judgment was entered in Buck's favor in either court. The court again noted that the distributions from the trusts occurred automatically by the terms of the trusts and by operation of law, not due to any *judgment* in either court. It also noted that Buck was a *defendant* in the four probate cases, and the Circuit Court Attorneys did not represent him in probate court where they filed their liens. The court acknowledged that the Circuit Court Attorneys might have a breach of contract claim against Buck if they were not paid, but it emphasized that they had no attorney lien. The probate court also recognized that, by the time of the argument on the motions to revise, the Circuit Court Attorneys had "seemingly" stopped arguing that they had an attorney lien under the applicable statutes and instead argued "for some sort of contractual lien." The court again noted that the contract had never been produced, and they had failed to explain how this "contractual lien" would have allegedly been perfected. As such, the court found that no lien rights existed. If the Circuit Court Attorneys believed they were entitled to attorney fees from Buck, the court noted, they would have to file a lawsuit against him to recover them. Watson Burns filed a separate notice of appeal. This Court entered an order consolidating the two appeals. Most of the parties then filed supplemental briefs.

## II. ISSUES PRESENTED

The parties raise a host of issues on appeal. The Circuit Court Attorneys present the following issues for review:

1.  Did the Probate Court err in its February 13, 2023 and October 13, 2023 orders granting interpleader, discharging petitioner trustee from liability, and distributing all of the interpleaded assets when, among other things, the Court:
    (i) summarily forfeited Appellants' liens and contractual rights without allowing any party to file answers and preserve defenses;
    (ii) summarily forfeited Appellants' liens and contractual rights without holding an evidentiary hearing;
    (iii) lacked lawful jurisdiction because its control over the interpleaded assets was derived from unlawful injunctive relief;
    (iv) distributed the funds to parties not entitled to prejudgment attachment of such funds; and
    (v) discharged the interpleading trustee without holding a hearing in violation of Rule 22 of the Tennessee Rules of Civil Procedure?
2.  Did the Probate Court err in its November 21, 2024 Order Denying Motions to Revise referred to by this Court as "the motion to alter or amend"?

Buck Dunavant filed a separate brief and presents the following issues:

1.  Whether the trial court erred by disbursing the interpleader funds

without sufficient evidence being admitted to find that Mary Douglas Dunavant (individually and as Guardian for Mary Wilkinson Dunavant and Lucy Hughes Dunavant) and Lillian Gardner Dunavant met their burden of establishing by a preponderance of the evidence that they have a right to the funds.

2. Whether the trial court erred by improperly granting a *sua sponte* motion for summary judgment.

The Trustee, Ben Adams, presents the following issues:

1. Whether the Appellant Law Firms waived their right to contest the Probate Court's granting of the <u>Trustee's Petition to Interplead Funds and for Discharge from Liability</u> ("Trustee's Interpleader") by failing to file any objection or contest to the Order granting the Interpleader in the trial court, and waived any claim of alleged defect to the Probate Court's Order granting of the Trustee's Interpleader when they answered and set forth a conflicting claim to the funds held by the Trustee.

2. Whether the Probate Court's <u>Order Denying the Law Firms' Motion to Revise</u> should be affirmed as to the Trustee's transfer of Trust assets to the Probate Clerk and the discharge of the Trustee from liability because the Appellants Watson Burns, PLLC and Bass Berry & Sims PLC (the "Law Firms") failed to establish any damages suffered by the Law Firms by Trustee's deposit of Trust funds with the Clerk of the Probate Court and the Trustee's release from liability?

3. Whether the Law Firms have waived their right to contest the November 21, 2024, <u>Order Denying Motion to Revise</u> because their Supplemental Brief egregiously fails to comply with the requirements set forth in Rule 27 of the Tennessee Rules of Appellate Procedure and Rule 6 of the Tennessee Court of Appeals preventing effective appellate review?

Mary Dunavant and the Dunavant children present the following issues for review:

1. Whether the trial court should be affirmed because the Appellant Law Firms have no valid right to an attorney's lien under Tennessee law.

2. Whether the trial court should be affirmed because the Appellant Law Firms substantially rely upon a document that is not in the record on appeal.

3. Whether the trial court should be affirmed because the Appellant Law Firms substantially rely upon recusal issues already decided by the Tennessee Supreme Court and irrelevant to the actual issues on appeal.

4.	Whether the trial court should be affirmed because the Appellant Law Firms raise multiple issues on appeal outside of the record in this case and for which they have no standing.

5.	Whether the Law Firms' Supplemental Brief and Supplemental Issue on Appeal should be dismissed and any arguments waived for failure to comply with the Tennessee Rules of Appellate Procedure and the Rules of the Court of Appeals of Tennessee.

6.	Whether the Law Firms' Supplemental Issue on Appeal should be denied because the Law Firms' motion to alter or amend was not timely filed.

7.	Whether the trial court should be affirmed because the Appellant Law Firms have failed to carry their burden to show the trial court abused its discretion.

For the following reasons, we affirm the decision of the probate court and remand for further proceedings.

## III. DISCUSSION

Before we examine all of the various issues presented on appeal, we will briefly examine the nature of an interpleader action, which we discussed at length in this Court's decision in *C & C North America Inc. v. Natural Stone Distributors, LLC*, 571 S.W.3d 254 (Tenn. Ct. App. 2018):

> "[I]nterpleader is designed to protect a stakeholder against the vexation of proceedings by two or more doubtful claimants when the whole matter may be settled in a single suit." *Woodard v. Metro. Life Ins. Co.*, 160 Tenn. 325, 24 S.W.2d 888, 889 (1930). Interpleader permits a "stakeholder who has no claim to the money and is willing to release it to the rightful claimant to put the money in dispute into court, withdraw from the proceeding, and leave the claimants to litigate between themselves the ownership of the fund in court." *Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 418 (6th Cir. 1997) (internal quotation omitted). The "stake" at issue can be a thing, debt, or fund. Lawrence A. Pivnick, 1 Tenn. Cir. Ct. Prac. § 1:27 (2017). Although "a limited fund or some specific, identifiable property" must be involved, "interpleader seldom will be rendered inappropriate because of the nature of the stake." Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, 7 Fed. Prac. & Proc. Civ. § 1704 (3d ed. 2018).
>
> Interpleader usually involves a two-stage procedure. Generally, "the stakeholder initiates the proceedings by filing a petition in which it sets forth the claims of the named defendants to a specified thing or fund in its possession, admits liability, disclaims any interest in the thing or fund, and offers to pay the fund into court." Pivnick, 1 Tenn. Cir. Ct. Prac. § 1:27. Thus,

in the first stage of the proceeding, the trial court determines whether the stakeholder has properly invoked interpleader. *Id*. If the trial court determines that interpleader is proper, the claimants plead against each other in the second stage if they have not already done so. *Id*. Then, the trial court proceeds to determine the claimants' respective rights to the thing or fund. *Id*.

*Id.* at 259-60.

Tennessee Rule of Civil Procedure 22.01 provides that "[p]ersons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability." Rule 22.02 further provides, in pertinent part:

Any property or amount involved as to which the party seeking interpleader admits liability may, upon order of the court, be deposited with the court or otherwise preserved, or secured by bond in amount sufficient to assure payment of the liability admitted. . . . Upon hearing, the court may order the party seeking interpleader discharged from liability as to property deposited or secured before determining the rights of the claimants thereto.

Tenn. R. Civ. P. 22.02. The Advisory Commission Comment explains that "[b]y depositing the property or amount claimed with the court, . . . a party may be protected against suit by any of the claimants, and may upon the hearing, be discharged from liability before the rights of the interpleaded parties have been determined." Tenn. R. Civ. P. 22.02, Adv. Comm'n Cmt.

On appeal, the Circuit Court Attorneys argue that the probate court erred in this interpleader action because it "discharged the interpleading trustee without holding a hearing in violation of Rule 22 of the Tennessee Rules of Civil Procedure." Rule 22.02 does state that "[u]pon hearing, the court may order the party seeking interpleader discharged from liability as to property deposited or secured before determining the rights of the claimants thereto." Tenn. R. Civ. P. 22.02. To briefly recap, the interpleader action was filed on November 29, 2022, by Trustee Ben Adams. The petition asserted that the Trustee held over $1 million in funds from the trusts due to Buck and that a portion had been ordered to be paid to the Dunavant children as settlement of the four probate cases and to Buck's attorney in those cases. The petition stated that the Circuit Court Attorneys claimed an attorney lien against the same trust distribution, and the competing claims exceeded the balance due from the trusts. The Trustee asserted that if he paid the amounts owed to the Dunavant Children, he would be subject to a lawsuit filed by the Circuit Court Attorneys. He claimed that if he paid the Circuit Court Attorneys, he would not have sufficient funds left to pay the sums awarded in the four probate cases, such that he could be found in contempt. Because the funds were subject to competing claims that could

subject him to litigation, the Trustee moved the court pursuant to Rule 22 for an order permitting him to deposit the disputed funds with the court clerk and for a discharge from liability and further participation in the case. One week later, on December 6, 2022, the Circuit Court Attorneys filed in the interpleader action a notice of their attorney charging lien. On December 7, the probate court entered its order granting the Trustee's petition to interplead the funds and discharging the Trustee from liability. Although this order was later vacated due to the pending recusal motion, the court entered another order mirroring this one without holding a hearing as contemplated by Rule 22.02.

We considered a similar situation, procedurally speaking, in *C & C North America*. In that case, the trial court entered its order permitting the petitioning party to interplead the funds "the day after the petition for interpleader was filed, before either defendant filed an answer, upon finding that '[the petitioner] admits liability for the amount of money forming the subject of this action but is in doubt as to who is entitled thereto.'" *C & C N. Am.*, 571 S.W.3d at 260. The appellant argued on appeal that "interpleader should never have been allowed in this case and that all of the trial court's subsequent orders are void as a result." *Id.* However, on appeal, we did not conclude that this procedure required reversal. First of all, we noted that the appellant who claimed on appeal that interpleader was improper had simply filed an answer to the interpleader petition and participated in the proceeding without filing any type of motion to dismiss the interpleader as improper or seeking a hearing on the propriety of the interpleader. *Id.* We recognized that "[o]bjections to interpleader may be waived by going to a hearing on the merits." *Id.* (citing 48 C.J.S. *Interpleader* § 38 (2018)). "In any event, however," we found that the appellant's arguments on appeal regarding why interpleader was improper were meritless. *Id.* at 261. We explained:

> The "modern trend" has been "toward increased availability of interpleader and relaxation of the historic restrictions on its use." Richard D. Freer, 4 *Moore's Federal Practice—Civil* § 22.03[1][h] (2018). According to Professors Banks and Entman, interpleader was historically subject to very "stringent rules that greatly limited the remedy's utility." Banks & Entman, *Tenn. Civ. Proc.* § 6-8(b). . . . However, these limitations were "discarded by the adoption of Rule 22.01[.]" . . . .
> In modern practice, "[t]he primary test for determining the propriety of interpleading the adverse claimants and discharging the stakeholder (the so-called 'first stage' of interpleader) is whether the stakeholder legitimately fears multiple vexation directed against a single fund." Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1704; *see also U.S. v. High Tech. Prods., Inc.*, 497 F.3d 637, 642 (6th Cir. 2007). "While interpleader should not be granted automatically, courts should allow it liberally." 48 C.J.S. *Interpleader* § 1.
> . . . "Existing *and prospective* claim[s] from separate parties are generally sufficient" to satisfy the jurisdictional requirement of multiple

- 20 -

liability for an interpleader action. 48 C.J.S. *Interpleader* § 9 (emphasis added); *see also* Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1707 ("[C]ourts should not hesitate to allow interpleader even when prospective claims are involved."). Interpleader can be invoked against a claimant who has not yet filed a claim or reduced its claim to judgment:

> [C]ourts should not dismiss an interpleader action simply because the claims confronting plaintiff have not been asserted. Nor is the fact that the claims, whether based on tort or contract, are not liquidated or have not been reduced to judgment relevant to a determination of the initial question whether interpleader should be granted.

Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1707 (footnote omitted). . . . "The plaintiff is not required to wait for legal proceedings to be commenced against him." *Am. Amicable Life Ins. Co. v. Roberson*, No. C.A. 10, 1986 WL 10144, at *2 (Tenn. Ct. App. Sept. 19, 1986) (quotation omitted). It is sufficient that the stakeholder ""is in danger of being molested by the assertion of conflicting rights."" *Id.* (quoting 45 Am. Jur. 2d. *Interpleader* § 7). "The stakeholder should file an interpleader action within a reasonable time after a dispute has arisen, without waiting to be sued." 48 C.J.S. *Interpleader* § 22; *see, e.g.*, *Taylor v. Bishop*, No. 88-364-II, 1989 WL 54911, at *1 (Tenn. Ct. App. May 24, 1989) (concluding that an attorney properly filed a bill of interpleader when she held an IRS check that was claimed by two parties and the attorney "feared she might suffer injury from the conflicting claims"). Because interpleader is intended to avoid "the risk of loss resulting from the threatened prosecution of multiple claims, the risk must be appraised in the light of the circumstances as they are in good faith alleged and shown to exist at the time when the suit was brought." *State of Texas v. State of Fla.*, 306 U.S. 398, 410, 59 S.Ct. 563, 83 L.Ed. 817 (1939). A "theoretical concern or hypothetical claim" is not sufficient to justify interpleader, and interpleader may not be maintained on a mere suspicion of double vexation. 48 C.J.S. *Interpleader* § 8. The stake holder must simply have "a good-faith and reasonable fear" of exposure to vexatious or conflicting claims. *Id.* . . .

. . . "[M]ost [courts] stress that the vexation and expense of possible multiple litigation warrants the use of interpleader even absent a substantial danger of multiple liability." Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1704; *see also Moore's Federal Practice* § 22.02[1] ("Even if multiple liability is unlikely, both the stakeholder and the judicial system avoid the expense and delay of multiple litigation.") Indeed, the Tennessee Supreme Court has recognized that "[t]he office of an interpleading suit is not to protect the parties against a *double liability*, but against double vexation on

account of *one liability.*" *Newsum v. Interstate Realty Co.*, 152 Tenn. 302, 278 S.W. 56, 56 (1925) (quotation omitted). The purpose of interpleader is "'for the stakeholder to protect itself against the problems posed by multiple claimants to a single fund.'" *Stonebridge Life Ins. Co. v. Horne*, No. W2012-00515-COA-R3-CV, 2012 WL 5870386, at *11 (Tenn. Ct. App. Nov. 21, 2012) (quoting *Michelman v. Lincoln Nat. Life Ins. Co.*, 685 F.3d 887, 894 (9th Cir. 2012)). . . .

On appeal, Seven Stone also argues that an investigation into Texas law would have revealed that Distributor's attachment claim in Texas would have failed. However, "[t]he availability of interpleader does not depend on the merits of the potential claims against the stakeholder." 48 C.J.S. *Interpleader* § 9; *see also Moore's Federal Practice* at § 22.03[1][a] ("Because interpleader is procedural, its availability does not depend on the merits of the claims asserted against the stakeholder.") In other words, "a determination of the respective merits of the adverse claims is inappropriate at the initial stage" of the interpleader proceeding. Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1704. One of the most significant benefits of interpleader is that it "prevents the stakeholder from being obliged to determine at his peril which claimant has the better claim." *Id.* § 1702. The stakeholder "should not be compelled to run the risk of guessing which claimant may recover from the fund." *Id.* § 1704. Interpleader gives the stakeholder "an opportunity to clothe his disbursement with the protection of a judicial determination." 48 C.J.S. *Interpleader* § 1. Accordingly, "[t]he stakeholder is not required to make a determination as to the rights of the prospective claimants but, rather, may deposit the contested funds with the court to avoid acting at his own peril and exposing himself to liability." *Id.* § 2.

In fact, "it is immaterial whether the stakeholder believes that all claims against the fund are meritorious. Indeed, in the usual case, at least one of the claims will be quite tenuous." Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1704 (footnote omitted); *see, e.g.*, *Paul Revere Life Ins. Co. v. Riddle*, 222 F.Supp. 867, 868 (E.D. Tenn. 1963) (concluding that a stakeholder had a right to maintain an interpleader action to avoid the vexation and expense of resisting adverse claims "even though its officials believed only one of them was meritorious" and the court recognized that "the plaintiff was never in any real danger of double liability under its contract"). "The mere fact that one of the adverse claims may be without merit, which is the usual situation, may not defeat the right of the stakeholder to invoke the remedy of interpleader which is intended for his protection." 48 C.J.S. Interpleader § 10. Even when the stakeholder denies liability to one of the claimants, "interpleader still protects the stakeholder from the vexation of multiple suits and the possibility of multiple liability that could result from adverse determinations in different courts." Wright, Miller, & Kane, Fed.

Prac. & Proc. Civ. § 1702 (footnote omitted). "So long as the stakeholder is confronted with multiple adverse claims or liability, interpleader is proper, even if the stakeholder does not believe that all the claims against the stake are meritorious." *Moore's Federal Practice* at § 22.03[1][a].

*C & C N. Am.*, 571 S.W.3d at 261-64. Applying these principles to the facts before us in *C & C North America*, we concluded that the petitioning party "legitimately feared multiple vexation directed against a single limited fund when it was threatened with an attachment action," and the party who argued on appeal that interpleader was improper had even admitted before the trial court that "there was 'an actual and justiciable controversy over entitlement to the interpleaded funds.'" *Id.* at 264. As such, we concluded that the interpleading party "appropriately filed an interpleader action so that the court could authoritatively decide how the limited fund was to be distributed," and we discerned no reversible error in the trial court's order permitting interpleader. *Id.*

Here, the Circuit Court Attorneys ultimately filed an answer and affirmative defenses in the interpleader action, and they admitted the vast majority of the allegations in the Trustee's petition. Notably, they admitted that the total amount of the claims asserted by the parties against the funds due to Buck from the trusts exceeded the balance of funds due to him, "such that if the Trustee were to pay the ordered funds to [the Dunavant children] and Harris Shelton, the Trustee would be subject to a lawsuit by the law firms of Bass, Berry & Sims, PLC, and Watson Burns, PLLC." Their answer did not assert any wrongdoing on behalf of the Trustee and in fact stated that "[t]he trustee should be discharged of any liability if after *an actual hearing* on the merits conducted in open Court and if the Court so finds." The Circuit Court Attorneys do not argue on appeal that any of the specific requirements for a proper interpleader, such as those discussed in *C & C North America*, were missing, aside from a hearing, nor do they allege any wrongdoing by the Trustee. The entire section of their brief addressing this issue simply states:

> Rule 22 of the Tennessee Rules of Civil Procedure is clear that "**[u]pon hearing**, the court may order the party seeking interpleader discharged from liability as to property deposited or secured before determining the rights of the claimants thereto." Tenn. R. Civ. P. 22.02 (emphasis added). The Court never held such a hearing. This Court should so find and, in doing so, determine that the Probate Court's February 13, 2023 and October 13, 2023 Orders were entered in violation of the Tennessee Rules of Civil Procedure and are unlawful.

As the Trustee aptly notes in his brief on appeal, the Circuit Court Attorneys have not demonstrated how they were damaged by the probate court's decision to grant his request to deposit the funds with the clerk and release him from further liability. We conclude that the trial court's failure to hold a hearing prior to granting the interpleader and discharging the Trustee was, at most, harmless error. *See* Tenn. R. App. P. 36(b) ("A final judgment

from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").[4]

We now turn to the issues raised by the parties regarding the second stage of the interpleader action. As we explained in *C & C North America*,

> In the second stage of an interpleader proceeding, "the court proceeds to adjudicate the claims before it just as it would in any other civil action." *Avant Petroleum, Inc. v. Banque Paribas*, 853 F.2d 140, 143 (2d Cir. 1988). "[T]he court determines the respective rights of the claimants to the fund or property at stake via normal litigation processes, including pleading, discovery, motions, and trial." *High Tech. Prod., Inc.*, 497 F.3d at 641. "[E]ach claimant has the burden of establishing the right to the fund or property by a preponderance of the evidence." Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1714. As in other cases, when there is no genuine issue of material fact, the second stage may be adjudicated on summary judgment motions. *Id.*

571 S.W.3d at 264-65. In the present case, the probate court's order granting the interpleader and discharging the Trustee also ordered that a portion of the interpleaded funds would be distributed to the Dunavant children in accordance with the orders entered in the four probate cases. We noted the irregularity of this procedure in the second Rule 10B appeal before this Court, observing as follows:

> [T]he court forfeited the Firms' "charging lien" in its initial order even though no party had answered the petition for interpleader and the trustee had not requested that relief in his petition. The court seemingly made factual findings without holding an evidentiary hearing. And it ordered distribution of the interpleaded funds to some claimants without hearing from all the competing claimants.

*Adams v. Dunavant*, 2023 WL 3066511, at *4, *rev'd,* 674 S.W.3d 871 (Tenn. 2023). On appeal, the Circuit Court Attorneys argue that the probate court erred by "summarily forfeit[ing] Appellants' liens and contractual rights without allowing any party to file answers and preserve defenses" and prematurely entering its order "without holding an evidentiary hearing." They argue that the parties should be ordered to return all of the disbursed funds to the probate court clerk for distribution in a manner consistent with their attorney liens.

---

[4] Because the Circuit Court Attorneys did point out the absence of a hearing in the probate court, we decline to find that this argument was waived on appeal.

- 24 -

We agree that the trial judge did not employ the proper procedure in summarily ordering that a portion of the interpleaded funds would be disbursed to the Dunavant children, apparently based on the trial judge's knowledge of the four probate cases, without first holding an evidentiary hearing and hearing from all the competing claimants. At the point when the trial court initially granted this relief, the only parties who had responded to the petition in any manner were the Circuit Court Attorneys, who had filed a notice of their attorney charging lien. After the Rule 10B appeal discussed above, however, further proceedings took place in probate court because not all of the interpleaded funds had been distributed. The Circuit Court Attorneys did file an answer and assert affirmative defenses. (No other respondent did, but they certainly had the opportunity to do so.) The Circuit Court Attorneys' answer made clear that they claimed a "statutory and/or common law attorney lien" against the trust distributions based on their representation of Buck in other litigation. The Circuit Court Attorneys then filed a motion to enforce their attorney charging lien. They also filed a petition for attorney fees and expenses. The court held an evidentiary hearing and heard testimony from Buck. The court entered an order distributing the remainder of the funds and found that the Circuit Court Attorneys presented no evidence in support of their claim to an attorney lien. However, the trial court then decided to have an additional hearing on the answer and affirmative defenses and petition for fees filed by the Circuit Court Attorneys, treating these as motions to revise a nonfinal order. After the Circuit Court Attorneys filed a written motion to revise, the court held an additional hearing. The probate court entered an additional order denying the motion to revise and setting out in detail why the Circuit Court Attorneys had no valid attorney lien under Tennessee law. While this procedure was admittedly unorthodox, it is clear to this Court that the Circuit Court Attorneys had the opportunity to assert their rights to the interpleaded funds that remained on deposit with the clerk of the court, and they did so. It is likewise clear that their claim rests entirely on their assertion of an attorney lien in connection with their representation of Buck in the circuit court litigation. At several points during the course of these protracted proceedings, the probate court held that they had no right to an attorney lien under Tennessee law. We can review the trial court's ultimate conclusion on appeal without the need to remand for yet another hearing in the probate court.

In the case at bar, the Circuit Court Attorneys claim to have an attorney lien against the trust distributions due to Buck. As such, we must examine the types of attorney liens:

> Two types of attorney's liens exist today either by the common law or by statute. The first type of lien is a retaining lien. A retaining lien is a possessory lien, *see Andrew Hall & Assocs. v. Ghanem*, 679 So.2d 60, 61 (Fla. Dist. Ct. App.1996); *In re Coronet Ins. Co.*, 298 Ill.App.3d 411, 232 Ill.Dec. 507, 698 N.E.2d 598, 601 (1998); *Panarello v. Panarello*, 245 N.J.Super. 318, 585 A.2d 428, 430 (Ch.Div.1990), that permits a lawyer to retain a client's books, papers, securities, or money coming into his or her possession during the course of the representation until the attorney and

client have settled their fee dispute or until the client has otherwise posted appropriate security for the outstanding fee. *See McDonald, Shea & Co. v. Charleston, C. & C. Railroad*, 93 Tenn. 281, 293, 24 S.W. 252, 255-56 (1893); *Brown & Reid v. Bigley*, 3 Tenn. Ch. (Cooper) 618, 621 (1878); *Hunt v. McClanahan*, 48 Tenn. (1 Heisk.) 503, 506-07 (1870); *see also Hoke v. Ortiz*, 83 N.Y.2d 323, 610 N.Y.S.2d 455, 632 N.E.2d 861, 865 (1994). A lawyer with a retaining lien has no independent right of action against the client that can be foreclosed or otherwise executed upon. *See McDonald, Shea & Co. v. Charleston, C. & C. Railroad*, 93 Tenn. at 293, 24 S.W. at 255-256; *Brown & Reid v. Bigley*, 3 Tenn. Ch. at 621; *see also Brauer v. Hotel Assocs., Inc.*, 40 N.J. 415, 192 A.2d 831, 833 (1963).

The second type of lien, a charging lien, is based on a lawyer's equitable right to have the fees and costs due for the lawyer's services in a particular action secured by the judgment or recovery in that action. *See Southern v. Beeler*, 183 Tenn. 272, 301-02, 195 S.W.2d 857, 870 (1946); *Keith v. Fitzhugh*, 83 Tenn. 49, 50 (1885); *see also Bennett v. Weitz*, 220 Mich.App. 295, 559 N.W.2d 354, 355 (1997); *Mack v. Moore*, 107 N.C.App. 87, 418 S.E.2d 685, 688 (1992); *Shaffer v. Charleston Area Med. Ctr., Inc.*, 199 W.Va. 428, 485 S.E.2d 12, 20-21 (1997). Unlike a retaining lien, a charging lien is not limited to the property in the attorney's possession. *See Brauer v. Hotel Assocs., Inc.*, 192 A.2d at 834. It attaches to any proceeds flowing from a judgment, as long as the lawyer worked to secure that judgment for the client. *See Butler v. GMAC*, 203 Tenn. 366, 370-71, 313 S.W.2d 260, 262 (1958); *see also Crolley v. O'Hare Int'l Bank*, 346 N.W.2d 156, 159 (Minn. 1984).

*Starks v. Browning*, 20 S.W.3d 645, 650-51 (Tenn. Ct. App. 1999). Before the trial court, the Circuit Court Attorneys consistently characterized their lien as a charging lien.

"Even though Tennessee courts had recognized and enforced common-law charging liens, the General Assembly created a statutory attorney's lien in 1899." *Id.* at 651 (internal citation and footnote omitted). Tennessee Code Annotated section 23-2-102 provides that attorneys "who begin a suit shall have a lien upon the plaintiff's or complainant's right of action from the date of the filing of the suit." Section 23-2-103 "provides a lien to an attorney who is substituted as plaintiff's counsel after an action has begun." *Schmitt v. Smith*, 118 S.W.3d 348, 351 (Tenn. 2003). It provides that an attorney "who is employed to prosecute a suit that has already been brought in any court of record shall have a lien upon the plaintiff's right of action from the date of the attorney's or solicitor's employment in the case . . . ." Tenn. Code Ann. § 23-2-103. So, the two sections "are mutually exclusive, as one applies to attorneys who begin a suit, and the other applies to attorneys hired after a suit has already been brought." *Schmitt*, 118 S.W.3d at 352. "However, the

analysis under both of the statutes is the same." *Id.*[5]

As previously noted, a charging lien "is based on a lawyer's equitable right to have the fees and costs due for the lawyer's services in a particular action secured *by the judgment or recovery in that action*," and "[i]t attaches to any proceeds flowing from a judgment, as long as the lawyer worked to secure that judgment for the client." *Starks*, 20 S.W.3d at 651-52 (emphasis added). The most glaring hole in the Circuit Court Attorneys' argument is the lack of any *judgment or recovery* in favor of Buck. As the probate court correctly noted, the distributions due to Buck from the trusts were not due to any judgment in his favor in either circuit or probate court. Those distributions occurred automatically under the terms of the trusts. Buck explained in his declaration, "In 1984, my father created an irrevocable trust for the benefit of all of his children. The 1984 Irrevocable Trust Agreement (the '1984 Trust') provided that his children, myself included, shall receive an equal share of the 1984 Trust. In 1991, my father created the Dunavant Children's Sprinkle Trust (the '1991 Trust'), also for the benefit of me and my siblings." Thus, Buck had been a beneficiary of the trusts since they were established, and the Circuit Court Attorneys performed no work causing that to happen. The circuit court litigation apparently remains pending, and the probate court cases were ostensibly settled and dismissed. In the absence of any judgment or recovery, the Circuit Court Attorneys have not shown that they are entitled to a charging lien.[6] *See Borena v. Yellow Cab Metro, Inc.*, 342 S.W.3d 506, 510 (Tenn. Ct. App. 2010) ("The resolution of this case was the dismissal of the action; thus, [the attorney] is entitled to nothing. . . . There is no money or property here as the case was dismissed."); *Judd's Inc. v. Muir*, No. E1999-01836-COA-R3-CV, 2000 WL 1708461, at *1 (Tenn. Ct. App. Nov. 16, 2000) (explaining that the attorney lien statutes apply to "a plaintiff's counsel who has secured an award of monies or other property for his client"); *Bill Hudson & Assocs., Inc. v. Elf Commc'ns, Inc.*, No. 88-251-II, 1989 WL 11875, at *3 (Tenn. Ct. App. Feb. 15, 1989) ("The lien described in these sections [23-2-102 and -103] applies only to the amount the attorney recovers for his client. Since there has been no recovery for Elf, Elf's attorneys do not have a lien on the funds held by the Clerk and Master.") (citation omitted).

Like the trial court, we note that the Circuit Court Attorneys have seemingly

---

[5] We note that "[w]hile a charging lien serves to secure an attorney's fees, it does not function as an adjudication of the rights between the lawyer and his or her client." *Schmitt*, 118 S.W.3d at 353 (quoting *Starks*, 20 S.W.3d at 652). "[A] trial court may declare the existence of an attorney's lien in the suit out of which the dispute regarding the attorney's fee arose, but ordinarily an attorney, not being a party to the proceeding, may not obtain a judgment with respect to his or her fee in that action." *Id.* at 353-54. An attorney "must generally commence a separate proceeding to enforce his or her contractual right to a fee, [but] an exception has been carved out in which the trial court may exert jurisdiction where the money or property that is the subject of the lien 'comes within the control of the court in the case in which the services were rendered.'" *Id.* (quoting *Starks*, 20 S.W.3d at 653).

[6] We recognize the possibility that the circuit court litigation could ultimately end with a judgment in favor of Buck. Still, however, the distributions to Buck from the 1984 and 1991 Trusts occurred independent of any potential future judgment in circuit court.

abandoned their argument that they have a statutory attorney charging lien, as their brief on appeal does not mention Tennessee Code Annotated section 23-2-102 or -103. Instead, they seem to argue that they are entitled to some sort of "contractual" attorney lien based on their fee agreement. Their brief states that they "have valid and enforceable contractual liens on the assets held in the Trusts," and the liens "are established by contract through [their] Fee Agreement with Mr. Dunavant." They contend that they were entitled to obtain their fees from the 1984 and 1991 Trusts, and this was not contingent upon Buck prevailing in the circuit court litigation but "simply contingent upon him being entitled to a distribution from the 1984 and 1991 Trusts."

We recognize that the fee agreement at issue is not in the record on appeal, but the Circuit Court Attorneys did offer to submit it during the hearing on the motion to revise. When the trial judge did not seem inclined to consider it, their attorney read its language to the trial judge during his argument. Counsel stated:

> And let me just read, and I think I can read this and don't think it violates any client confidence. Our agreement specifically says we receive 40 percent of any gross recovery. The contract says quote, the gross recovery shall mean any settlement, judgment, insurance proceeds or corporate stock or anything of value or compensation of any kind we are seeking or have the right to receive from any source in connection with your lawsuit or any payment from any trust or will established by your father or his family for you regardless of whether it is directly implicated or a part of your lawsuit, closed quote. That's what it says. It also says the parties agree that *the firm shall have an attorney lien under Tennessee law with respect to the contingency fee*.

In their motion to revise, the Circuit Court Attorneys similarly stated that Buck "confirmed in the Fee Agreement that the Firms are entitled to an attorney lien on these assets." Notably, then, the type of lien provided in the fee agreement was "an attorney lien under Tennessee law."

On appeal, the Circuit Court Attorneys argue that the probate court "was required under Tennessee law to enforce the Firms' contractual liens." However, this Court has repeatedly recognized that "[t]wo types of attorney's liens exist in Tennessee either by common law or by statute," and those are retaining liens and charging liens. *McCarter v. McCarter,* No. E2015-00549-COA-R3-CV, 2016 WL 3209462, at *3 (Tenn. Ct. App. June 1, 2016); *Johnston v. Johnston*, No. E2013-00525-COA-R3-CV, 2014 WL 890758, at *23 (Tenn. Ct. App. Mar. 6, 2014) *perm. app. denied* (Tenn. June 20, 2014); *see also Castle v. David Dorris Logging, Inc.*, No. W2012-00917-COA-R3-CV, 2013 WL 500780, at *4 (Tenn. Ct. App. Feb. 11, 2013) (quoting *Starks*, 20 S.W.3d at 650-51). We decline to find that the contractual language in the fee agreement recognizing that the Circuit Court Attorneys will "have an attorney lien under Tennessee law" would independently give rise

- 28 -

to some sort of "contractual" attorney lien, when the requirements for a charging lien are clearly not met. The Circuit Court Attorneys rely on four cases as support for their argument, but we conclude that none of them support their position. Primarily, the Circuit Court Attorneys rely on this Court's decision in *Baker-Brunkhorst v. Brunkhorst*, No. W2020-00154-COA-R3-CV, 2021 WL 673208 (Tenn. Ct. App. Feb. 22, 2021). They contend that *Baker-Brunkhorst* is an example of a case in which an "attorney lien that was not contingent on the outcome of the case" was enforced where the wife in a divorce action granted her attorneys a lien against marital property in return for legal representation. However, this is not an accurate characterization of the case.

In *Baker-Brunkhorst*, the attorney who initially represented the wife in a divorce action withdrew, and she subsequently retained a law firm to represent her. *Id.* at *1. The fee agreement provided that the firm had a right to place a lien on "all property, money, assets, alimony or things of value that [were] recovered, obtained, preserved, or protected" in the divorce action to satisfy the attorney fees. *Id.* The firm later "filed a Notice of Attorney's Lien and Abstract of Suit in accordance with Tenn. Code Ann. § 23-2-102 requesting that an attorney's lien attach against the Hollywood Drive properties to satisfy Wife's attorney's fees[.]" *Id.* The firm also filed a motion to perfect and enforce its attorney lien. *Id.* After a hearing, the trial court awarded the firm a judgment against the wife for its attorney fees and granted the firm's motion to perfect and enforce the lien. *Id.* at *2. On appeal, we explained,

> A charging lien, like the one here, is premised "on a lawyer's equitable right to have the fees and costs due for the lawyer's services in a particular action secured by the judgment or recovery in that action." *Starks v. Browning*, 20 S.W.3d 645, 650 (Tenn. Ct. App. 1999) (citations omitted). Tennessee Code Annotated § 23-2-103 provides that "[a]ny attorney or solicitor who is employed to prosecute a suit that has already been brought in any court of record shall have a lien upon the plaintiff's right of action from the date of the attorney's or solicitor's employment in the case." An attorney's lien "attaches to any proceeds flowing from a judgment, as long as the lawyer worked to secure the judgment for the client." *Starks*, 20 S.W.3d at 651 (citations omitted).
> . . . .
> The facts are largely undisputed. Wife signed a contract allowing [the firm] to satisfy its claim for attorney's fees by placing a lien on any property, money, or assets recovered in the divorce. Although Wife was to convey her interest in the Hollywood Drive properties to Husband and Husband was to pay Wife the equity in the properties, Husband died before Wife conveyed her interest in the properties to him. Thus, Husband and Wife still owned the Hollywood Drive properties as tenants by the entirety at the time of Husband's death, and Husband still owed Wife the equity in the properties. Moreover, although each had a contractual duty that survived Husband's

- 29 -

death, upon Husband's death, Wife continued "to own the whole in fee simple." *See Bryant v. Bryant*, 522 S.W.3d 392, 400 (Tenn. 2017). Accordingly, Wife owned the Hollywood Drive properties when [the firm] filed and recorded its Lien and Abstract of Suit.

<u>It is undisputed that [the firm] secured for Wife the equity in the Hollywood Drive properties</u> and that Husband failed to remit any of the installment payments required by the MDA and final divorce decree. Moreover, Wife remained an owner of the properties at all material times. As previously stated, <u>an attorney's lien "attaches to any proceeds flowing from a judgment, as long as the lawyer worked to secure the judgment for the client." *Starks*, 20 S.W.3d at 651. Therefore, the trial court correctly found that [the firm] secured for Wife the equity in the Hollywood Drive properties</u> and that neither Husband nor Husband's estate paid the equity in the properties to Wife.

*Id.* at *3-4 (emphasis added). Thus, in *Baker-Brunkhorst*, the requirements for an attorney charging lien were met. We explicitly stated that "[the firm's] lien is based on Tenn. Code Ann. § 23-2-103, not -102, because [the firm] did not begin the suit." *Id.* at *1 n.5. As such, this case does not support the Circuit Court Attorneys' apparent contention that are entitled to some sort of contractual "attorney lien" when the statutory requirements for a charging lien are not met.

The Circuit Court Attorneys argue that "[a] number of additional cases establish that this Court should have enforced the liens at issue here." Again, however, the cases they cite involve attorney charging liens under the statutes. In *Peoples National Bank of Washington v. King*, 697 S.W.2d 344, 344 (Tenn. 1985), for example, the Tennessee Supreme Court granted permission to appeal to determine "whether the expenses directly incurred by an attorney in the prosecution of his client's claim are entitled to lien status under T.C.A. section 23-2-102 where expenses are expressly provided for in the contract with the client." The Court held that "the Court of Appeals erred in concluding that the attorney's lien granted by T.C.A. section 23-2-102 extended only to [the attorney's] contractual contingent fee agreement." *Id.* at 346. The Supreme Court concluded that "the statutory lien encompasses expenses directly, necessarily and reasonably incurred by the attorney in the prosecution of the action or claim that has resulted in a recovery for the client." *Id.* at 347. The Circuit Court Attorneys also rely on *W. Life Ins. Co. v. Nanney*, 296 F. Supp. 432, 440 (E.D. Tenn. 1969), but again, the court's analysis is of the statutory lien. *See id.* ("Attorneys of record who begin a suit in a court of record in Tennessee have a lien upon the plaintiff's right of action from the date of the filing of the suit. T.C.A. § 29-202.")

Finally, the Circuit Court Attorneys argue that the probate court "was required under Tennessee law to enforce the Firms' contractual liens because it assumed control and dominion and exercised jurisdiction over the funds at issue." They rely on *In re Estate of*

*Arthur*, 302 S.W.3d 284 (Tenn. Ct. App. 2009). In that case, an agreed order was entered in an estate matter, stating that an attorney would be paid $2,500 for services to the estate. *Id.* at 286. The probate court then found that the attorney was entitled to an attorney lien against his client's share of the estate. *Id.* The issue on appeal was whether the probate court "had jurisdiction to allow the lien." *Id.* We explained that "an attorney must generally commence a separate proceeding to enforce his or her contractual right to a fee," but "an exception has been carved out in which the trial court may exert jurisdiction where the money or property that is the subject of the lien 'comes within the control of the court in the case in which the services were rendered.'" *Id.* at 287 (quoting *Schmitt*, 118 S.W.3d at 354). We concluded that the probate court "had jurisdiction over the Estate, and therefore, control over the money or property that was the subject of the lien[.]" *Id.* The case fit the exception because "[t]he money or property that is the subject of the lien came within the control of the Probate Court *in the case in which [the attorney] rendered services*." *Id.* As such, the court had jurisdiction to grant an attorney lien "for his services rendered in this case." *Id.* Again, this case does not support the Circuit Court Attorneys' position.

We find more guidance from this Court's decision in *Chambers v. Devore*, No. W2013-02827-COA-R3-CV, 2015 WL 4381631 (Tenn. Ct. App. July 17, 2015). In *Chambers*, an attorney fee agreement provided for a contingency fee and further provided that the law firm "will have the right to place an attorney's fee lien against any recovery." *Id.* at *2. We noted that the client did not dispute the firms' *right* to an attorney lien in the trial court, as it was "provided for both in her contract with [the law firm] and by state statute," as "Tennessee Code Annotated Section 23-2-102 provides that '[a]ttorneys and solicitors of record who begin a suit shall have a lien upon the plaintiff's [] right of action from the date of the filing of the suit.'" *Id.* We likewise observed that the law firm was "entitled to an attorney's lien under both contract and statute." *Id.* at *7. Quoting the familiar language from *Starks*, we explained that "[i]n order to secure payment for services an attorney has rendered to his or her client in good faith, in Tennessee '[t]wo types of attorney's liens exist today either by the common law or by statute.'" *Id.* (quoting *Starks*, 20 S.W.3d at 650). Those two types of liens are retaining liens and charging liens. *Id.* We determined that the particular type of lien at issue in that case was "a charging lien." *Id.* A charging lien "is based on a lawyer's equitable right to have the fees and costs due for the lawyer's services in a particular action secured by the judgment or recovery in that action," and it "attaches to any proceeds flowing from a judgment, as long as the lawyer worked to secure that judgment for the client." *Id.* (quoting *Starks*, 20 S.W.3d at 650).

We reach the same conclusion here. The fee agreement with Buck contains language generally providing that the Circuit Court Attorneys will "have an attorney lien under Tennessee law," so they are "entitled to an attorney's lien under both contract and statute." *See id.* However, the fact remains that the type of attorney lien at issue is a charging lien. The Circuit Court Attorneys are not entitled to a charging lien against the distributions from the 1984 Trust or 1991 Trust because those distributions were due to

- 31 -

Buck under the terms of those trusts, created decades ago, and not due to any judgment or recovery in circuit court. The fact that Buck promised to pay the Circuit Court Attorneys *from* the trust distributions does not create an attorney charging lien. The Court entered a similar situation in *Gribble v. Ford*, 52 S.W. 1007 (Tenn. Ch. App. 1898), *aff'd* (Tenn. Jan. 12, 1899). In *Gribble*, the complainants were attorneys who sought to recover sums allegedly due them for professional services rendered to J.J. Ford. *Id.* at 1007. They alleged that Ford was indebted to them in the sum of $300 for representing him in a slander suit that resulted in a judgment in Ford's favor for over $3,000. *Id.* The attorneys further alleged that Ford had employed them at a fee of $300 to represent his brother in a separate false imprisonment suit in circuit court "and agreed that this fee should be paid out of his recovery in the slander suit[.]" *Id.* at 1007-09. The court explained that "the verbal promise of defendant Ford to pay them the $300 fee in the suit of his brother [] out of the proceeds of his recovery in the slander suit created no attorney's or other lien on the proceeds of that recovery." *Id.* at 1010.

In summary, the fee agreement may very well provide that the Circuit Court Attorneys' right to *payment* is not contingent upon any recovery in the litigation, but their right to an attorney charging lien under Tennessee law is. We conclude that the Circuit Court Attorneys have not demonstrated their entitlement to an attorney charging lien. Thus, their claim to the interpleaded funds must fail. As we explained in *C & C North America*,

> Being named an interpleader defendant in stage one of the proceeding does not necessarily entitle a claimant to a portion of the interpleaded funds in stage two. *See Berryman v. Lannom*, 94 So.3d 1238, 1242 (Miss. Ct. App. 2012). "Interpleader does not create liability when it would not exist under state substantive law. Instead, it merely accelerates assertion of a claim[.]" *Moore's Federal Practice* at § 22.03[1][e]. At the second stage of the proceeding, "each claimant has the burden of establishing the right *to the fund or property* by a preponderance of the evidence." Wright, Miller, & Kane, Fed. Prac. & Proc. Civ. § 1714 (emphasis added). "To entitle a claimant to a decree, he must have a title or lien, legal or equitable, with respect to the fund deposited." 48 C.J.S. *Interpleader* § 45.

571 S.W.3d at 266-67.[7] The claimants "must recover on the strength of their own title

---

[7] In *C & C North America*, a distributor asserted a cross-claim to the interpleaded funds that was "simply in the nature of a breach of contract claim." 571 S.W.3d at 265. The trial court found that the distributor "had a legitimate claim . . . for a debt" and awarded the distributor a judgment for the amount it was owed "to be paid from the interpleaded funds." *Id.* at 266. On appeal, we concluded that the trial court erred in ordering the judgment paid from the interpleaded funds. *Id.* We explained that the distributor "had a right to a judgment . . . but it did not successfully assert any lien or attachment claim to the interpleaded funds." *Id.* The fact that the distributor was "owed money . . . did not give it 'a right to any interest in the [interpleaded funds]' in the absence of a lien, attachment, or similar claim.'" *Id.* at 267 (quoting *John Weis*,

rather than on the weakness of that of the adversary." *Id.* at 265 (quoting *John Weis*, 118 S.W.2d at 681).

The Circuit Court Attorneys raise a separate issue on appeal regarding whether the probate court "lacked lawful jurisdiction because its control over the interpleaded assets was derived from unlawful injunctive relief." They argue that the temporary injunction was improperly granted in the four probate cases, so the probate court's "exercise of jurisdiction over the interpleaded funds [was] in error." They argue,

> The Probate Court was never lawfully entitled to exercise jurisdiction over the funds in question in the first instance. The Probate Court did so through the issuance of unlawful injunctive relief. Because the Court was not lawfully entitled to control the funds in the first instance, all of the Probate Court's Orders pertaining to the distribution of the Trust funds, including, the February 13, 2023 and October 13, 2023 Orders [in the interpleader action], are unlawful and must be vacated.

The Circuit Court Attorneys assert that the injunction was improperly entered because, when considering the four factors for determining whether to issue a temporary injunction, the court improperly found a threat of irreparable harm. In addition, they argue that the injunction should not have been entered due to spendthrift provisions in the Trusts. In response, the Dunavant children emphasize that the temporary injunction was entered *in one or more of the four probate cases*, those cases were ultimately dismissed, and the Circuit Court Attorneys were not parties to those cases. Thus, they argue that "any argument about them here is an irrelevant diversionary tactic." We agree.

Any issues regarding the injunctive relief entered in the four probate cases are simply not before this Court in this appeal. *See, e.g.*, *Harris v. Tenn. Rehab. Initiative in Correction*, No. M2013-00501-COA-R3-CV, 2014 WL 1778349, at *3 (Tenn. Ct. App. Apr. 30, 2014) *perm. app. denied* (Tenn. Sept. 19, 2014) ("Plaintiffs complain on appeal that neither of the trial courts below heard the merits of their claims, and they contend they have been deprived of their due process rights. The scope of this appeal is constrained, however, by the posture in which it comes to us. The only appeal properly before this court involves the orders rendered by Part III of the Chancery Court. The decisions arising from

_____

*Inc. v. Reed*, 118 S.W.2d 677, 682 (1938)). Therefore, the trial court should not have ordered the judgment to be paid from the interpleaded funds. *Id. See also John Weis*, 118 S.W.2d at 682 ("We think the Chancellor erred in ordering the distribution of the [interpleaded] proceeds of the policy among all these creditors, for the reason that they had no liens on the proceeds of the policy, with the exception of the two parties above named. The fact that Mrs. Reed owed them did not give them a right to any interest in the proceeds of the policy unless they had liens thereon[.]").

Here, the Circuit Court Attorneys argue that the trial court should have recognized their attorney lien, but they do not argue that the probate court should have entered a judgment for their attorney fees. They emphasize that they are not seeking an award of fees from the court.

the proceedings in Part II of the Chancery Court are not part of this appeal[.]").[8] Moreover, the Circuit Court Attorneys cite no legal authority for their bare assertion that the probate court's orders *in the interpleader action* "are unlawful and must be vacated." "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Sup. Ct.*, 301 S.W.3d 603, 615 (Tenn. 2010).

The next issue raised by the Circuit Court Attorneys on appeal is whether the probate court erred when it "distributed the funds to parties not entitled to prejudgment attachment of such funds." Specifically, they argue that the Dunavant children "were not entitled to prejudgment attachment of the Trust'[s] assets." They quote Tennessee Code Annotated section 29-6-101, which provides eight circumstances in which "[a]ny person having a debt or demand due at the commencement of an action, or a plaintiff after action for any cause has been brought, and either before or after judgment, may sue out an attachment at law or in equity, against the property of a debtor or defendant[.]" The Circuit Court Attorneys summarily state that "[n]one of these circumstances apply here." As a result, they insist that "this Court should vacate the Probate Court's unlawful attachment of the Trust funds that Mr. Dunavant was entitled to receive and vacate the erroneous orders of the Probate Court, including the February 13, 2023 and October 13, 2023 Orders."

This argument is admittedly a bit perplexing. Because this section of the Circuit Court Attorneys' brief does not cite to the appellate record, which consists of over 4,000 pages, it is difficult to discern the precise basis for their argument. From their argument alone, it is not entirely clear whether they are referring, at least in part, to actions taken in the four probate cases. The Circuit Court Attorneys asserted in their answer to the interpleader action that "the Temporary Restraining Order and Temporary Injunction entered by then Judge Karen Webster [in the four probate cases] had no basis in law or fact and should be declared void *ab initio* and of no legal effect because . . . the freeze on these assets constituted an unlawful 'pre-judgment attachment' in violation of Tennessee law." The Circuit Court Attorneys' motion to enforce their attorney lien similarly argued that "[t]he injunction was, in effect, an unlawful prejudgment attachment which met none of the elements of the Tennessee prejudgment attachment statute." In the "Statement of the Case" section of their brief on appeal, they likewise state that "[t]he injunction was, in effect, an unlawful prejudgment attachment which met none of the elements of the Tennessee prejudgment attachment statute." Again, issues regarding the injunctive relief entered in the four probate court cases are not before us on appeal. This is an appeal of the interpleader action. The Dunavant children did not "sue out an attachment at law or in

---

[8] The Circuit Court Attorneys argue in their reply brief that the interpleader action is "simply an extension of" the four probate cases and that they are "inextricably intertwined." They insist that they have "standing to argue about the errors committed" in the four probate cases. The problem, however, is that the interpleader action was filed as a separate lawsuit with a separate docket number. This is an appeal from the interpleader action only. We cannot review alleged errors in the four probate cases in this appeal.

equity" pursuant to this statute. Furthermore, the Circuit Court Attorneys do not cite to any location in the record to show that the probate court found the Dunavant children were entitled to a "prejudgment attachment." Thus, their limited argument regarding this statute does not entitle them to relief on appeal.

The final issue raised on appeal by the Circuit Court Attorneys was presented in their supplemental brief to this Court.[9] The issue states: "Did the Probate Court err in its November 21, 2024 Order Denying Motions to Revise referred to by this Court as 'the motion to alter or amend'?" The Circuit Court Attorneys first suggest that "Rule 54.02 does not address 'motions to revise' and seems to be incorrectly cited by the trial court." However, "the rules allow for motions 'to alter or amend a judgment,' Tenn. R. Civ. P. 59.04, or motions 'to revise' a non-final partial judgment, *see* Tenn. R. Civ. P. 54.02." *Harris v. Chern*, 33 S.W.3d 741, 743 (Tenn. 2000). Thus, "a Rule 54.02 motion to revise" is appropriate for non-final orders. *See id.* at 744.

Rather than addressing the standards applicable to a motion to revise, the supplemental brief reasserts the arguments previously considered and rejected by this Court from their initial brief, including that a hearing was required by Rule 22 and that the probate court failed to follow the proper procedure in adjudicating the interpleader action. The Circuit Court Attorneys also argue that the hearings provided throughout the remainder of the interpleader action "did not cure" the errors that preceded them. We disagree. Over the course of the two years the interpleader action was pending, the Circuit Court Attorneys filed an answer and various motions, along with a declaration, making it clear that they were pursuing the funds on the basis of an attorney charging lien. It is not necessary to reverse or vacate and remand for further proceedings due to the procedural error. In fact, the Circuit Court Attorneys' reply brief on appeal states, "Notably, sufficient evidence is included in the record to establish the agreement between the Firms and Buchanan Dobson Dunavant with respect to the interpleaded funds." Having determined that no attorney charging lien existed, we conclude that the Circuit Court Attorneys are not entitled to the interpleaded funds. *See C & C North America*, 571 S.W.3d at 266-67 ("At the second stage of the proceeding, each claimant has the burden of establishing the right *to the fund or property* by a preponderance of the evidence. To entitle a claimant to a decree, he must have a title or lien, legal or equitable, with respect to the fund deposited.") (citations omitted).

---

[9] We agree with the Trustee and the Dunavant children that the Circuit Court Attorneys' supplemental brief "egregiously fails to comply with the requirements set forth in Rule 27 of the Tennessee Rules of Appellate Procedure and Rule 6 of the Tennessee Court of Appeals[.]" It does not contain a single citation to the record. At the same time, their principal brief contained citations to the record, and the supplemental brief is very short, containing only two paragraphs of argument. Accordingly, we have considered it, at least to the extent the argument is supported by citation to legal authority.

We disagree with the Dunavant children's assertion in their supplemental brief that the Circuit Court Attorneys' motion to revise was not timely filed.

Next, we consider the issues presented on appeal by Buck. He frames those issues as follows:

1. Whether the trial court erred by disbursing the interpleader funds without sufficient evidence being admitted to find that Mary Douglas Dunavant (individually and as Guardian for Mary Wilkinson Dunavant and Lucy Hughes Dunavant) and Lillian Gardner Dunavant met their burden of establishing by a preponderance of the evidence that they have a right to the funds.

2. Whether the trial court erred by improperly granting a *sua sponte* motion for summary judgment.

Buck argues that the probate court entered its order distributing funds to the Dunavant children shortly after the petition was filed and "did not permit any party to answer the interpleader action prior to entering its order, and it did not allow for any evidence to be entered upon which it could justify an order." Thus, he argues that the Dunavant children failed to meet their burden of proving they were entitled to receipt of the funds. Because the order granting interpleader was entered before evidence was presented, Buck suggests that "the closest approximation of the Probate Court's action is a *sua sponte* award of summary judgment."

Buck does not cite to any portion of the voluminous record on appeal to demonstrate that he ever raised these arguments in the trial court. Rule 6 of the Rules of the Court of Appeals of Tennessee provides:

(a) Written argument in regard to each issue on appeal shall contain:
(1) A statement by the appellant of the alleged erroneous action of the trial court which raises the issue and a statement by the appellee of any action of the trial court which is relied upon to correct the alleged error, with citation to the record where the erroneous or corrective action is recorded.
(2) *A statement showing how such alleged error was seasonably called to the attention of the trial judge with citation to that part of the record where appellant's challenge of the alleged error is recorded.*
(3) A statement reciting wherein appellant was prejudiced by such alleged error, with citations to the record showing where the resultant prejudice is recorded.
(4) A statement of each determinative fact relied upon with citation to the record where evidence of each such fact may be found.
(b) No complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. No assertion of fact will be considered on appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.

(emphasis added). Buck never filed an answer to the interpleader petition, like the Circuit Court Attorneys did. The record contains a "Declaration of Buchanan Dobson Dunavant," which stated, "I am involved in the instant interpleader matter . . . I am represented in this matter by Patrick G. Walker of Harris Shelton, PLLC. I am not represented in this matter by John S. Golwen or A. Alex Agee of Bass, Berry & Sims, PLC or William F. Burns, Frank L. Watson, III, or William E. Routt of Watson Burns, PLLC." However, this document was e-filed by William E. Routt. Thus, we surmise that this declaration was not filed by Buck or on his behalf.[10]

Three days later, Patrick Walker filed a notice of appearance on behalf of Buck and Harris Shelton. Meanwhile, petitions for attorney fees and/or attorney charging liens were filed by the Circuit Court Attorneys, Harris Shelton, and the Trustee. An affidavit of Buck was filed, stating that he did not dispute the attorney fee claimed by Harris Shelton. Mary Dunavant also filed her notice of intent to levy in connection with the judgment she had obtained for child support and alimony. A separate attorney, Mr. Markowitz, then filed a notice of appearance on behalf of Buck for the limited purpose of addressing the issue of levy and garnishment. He filed a memorandum on Buck's behalf in opposition to the levy. However, from our review of the record, it appears that no other memorandum or pleading was filed on behalf of Buck. At the evidentiary hearing, Buck briefly testified that he approved the attorney fees sought by Harris Shelton. He also testified as to the oral settlement agreement he had reached with Mary with respect to disbursement of the remaining funds. We find nothing to indicate that Buck ever raised the arguments he now asserts on appeal, regarding whether the trial court erred by disbursing interpleaded funds to the Dunavant children without them meeting their burden by a preponderance of the evidence, or whether the trial court erred by improperly granting a *sua sponte* motion for summary judgment.

This Court explained in *C & C North America*,

Objections to interpleader may be waived by going to a hearing on the merits. 48 C.J.S. *Interpleader* § 38 (2018); *see, e.g.*, *Supreme Lodge Knights of Honor v. Selby*, 153 N.C. 203, 69 S.E. 51, 52 (1910) (concluding that defendants who "answered and set up their conflicting claims to the fund" waived an alleged defect with regard to the interpleader); *c.f. Henegar v. Brannon*, 24 Tenn.App. 1, 137 S.W.2d 889, 891-92 (1939) (concluding that a party who paid funds into court and "asked the chancellor to decree who was entitled thereto" could not complain on appeal that the interpleader was

---

[10] The declaration described the Circuit Court Attorneys' representation of Buck in other litigation, their fee agreement, the trusts, and his involvement in the four probate cases, and it concluded by stating, "Watson Burns and Bass Berry should be paid pursuant to our agreement, and I am in favor of having a hearing and obtaining court confirmation of their liens if that is necessary for our agreement to be satisfied."

improper).

571 S.W.3d at 260. Here, we conclude that Buck waived the issues he now seeks to present on appeal by participating in the interpleader action without filing an answer or otherwise raising these issues before the trial court. "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal." *Emory v. Memphis City Schs. Bd. of Educ.*, 514 S.W.3d 129, 146 (Tenn. 2017) (quoting *In re Adoption of E.N.R.*, 42 S.W.3d 26, 32-33 (Tenn. 2001)).[11]

## IV.  CONCLUSION

For the aforementioned reasons, the decision of the probate court is hereby affirmed and remanded. All remaining issues are pretermitted. Costs of this appeal are taxed to the appellants, Watson Burns, PLLC; Bass, Berry & Sims, PLC; and Buchanan Dobson Dunavant, for which execution may issue if necessary.

s/Carma Dennis McGee
CARMA DENNIS MCGEE, JUDGE

---

[11] In the Circuit Court Attorneys' reply brief, they argue that Buck's brief on appeal "argues persuasively that the trial court erred by disbursing the interpleader funds without sufficient evidence being admitted to find that the [Dunavant children] met their burden of establishing by a preponderance of the evidence that they have a right to the funds and by granting a sua sponte motion for summary judgment." They argue, "The judgment of the trial court should be reversed for these reasons." To the extent that they are attempting to adopt Buck's issues as their own, we note that "[i]ssues raised for the first time in a reply brief are waived." *Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 724 (Tenn. 2017).